UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
BARBARA GARCIA BEAUCHAT,

                Plaintiff,

                                                            **MEMORANDUM & ORDER**
      - against -                                           03 Civ. 3196 (DRH) (ETB)

NORMAN Y. MINETA, SECRETARY,
DEPARTMENT OF TRANSPORTATION,

                Defendant.
----------------------------------X

**APPEARANCES :**

**ZABELL & ASSOCIATIONS, P.C.**
Attorneys for Plaintiff
700 Lakeland Avenue
Bohemia, New York 11716
By: R. Elizabeth Urena, Esq., & Saul D. Zabell, Esq.

**ROSLYNN R. MAUSKOPF, UNITED STATES ATTORNEY, EASTERN DISTRICT OF NEW YORK**
Attorney for Defendant
147 Pierrepont Street
Brooklyn, New York 11201
By: Kevin P. Mulry, Esq.


**HURLEY, Senior District Judge:**

       Plaintiff Barbara Garcia Beauchat ("Plaintiff") brought the present action against Defendant Norman Y. Mineta, Secretary for the Department of Transportation ("Defendant") for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the New York State Human Rights Law ("NYSHRL") § 296, claiming she was discriminated against on the basis of her gender and national origin, and for a violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a)(2). Defendant now moves for summary judgment pursuant to

Federal Rule of Civil Procedure ("Rule") 56(c) on the grounds that Plaintiff has failed to make a prima facie case of discrimination under Title VII, that she has no private right of action under the FMLA, and that the NYSHRL § 296 is preempted by federal law in this instance. Plaintiff opposes the motion. For the reasons set forth herein, Defendant's motion for summary judgment is GRANTED in its entirety.

*BACKGROUND*

The following summary of facts is drawn from the parties' Local 56.1 statements, and the parties submissions. The facts are undisputed unless otherwise noted. Plaintiff is a Hispanic Apache female, residing in Suffolk County, New York. Defendant is the representative of the branch of the federal government that provides Plaintiff's employment.

Plaintiff worked as an "air traffic control specialist" or, at other times, an "air space management specialist" beginning in 1994. In 2000, she began her career with the United States Department of Transportation, Federal Aviation Administration ("FAA"), as an air traffic control specialist, *i.e.* air traffic controller in New Orleans. After nearly two years at that position, Plaintiff sought, and received a transfer to the New York area and began training at the New York Terminal Radar Approach Control (hereinafter "TRACON") facility in Westbury, New York. She is married to John Beauchat, also an air traffic controller, who transferred to the New York area with her and trained with her. Plaintiff is currently employed by the FAA as an air traffic controller at LaGuardia Tower.

When Plaintiff relocated to the New York area, her instructor at TRACON was John Maguin ("Maguin"). Maguin provided lab instruction to Plaintiff. Plaintiff alleges that he treated her different than the other students, monitored her more closely than the other students,

was extremely critical of her mistakes, sometimes refused to give her help she requested, and refused her requests for leave. (*See* Decl. of R. Elizabeth Urena, Ex. C (hereinafter "Pl.'s Dep.") at 23.) Maguin also commented that he believed Plaintiff did not belong at TRACON. (*Id.* at 26.) Plaintiff complained about Maguin's actions, believing that they were motivated by his bias against either her gender and national origin (*see id.* at 25-26). Plaintiff asserts that her husband, a Caucasian male, was treated much better than she was, such as receiving days off when her identical requests were rejected. Plaintiff contends that because others did not agree with Maguin regarding whether Plaintiff "belonged," he was replaced by Roger Stebens ("Stebens"). (*Id.* at 31.) Under Stebens, Plaintiff completed the classroom phase of her training and suffered no delay in the completion thereof. (*Id.* at 33.)

After her classroom training was completed, Plaintiff began her on-the-job training in December 2001. She was in the on-the-job training phase until March 2002. Her training supervisor was Michael Santos ("Santos"), and her training team instructors were Richard Devivo ("Devivo"), her primary instructor, and Victor Starr ("Starr"), her secondary instructor. Plaintiff averred that Santos told her that no one wanted to train her (Pl.'s Dep. at 35-37; 50); Santos stated that he did not recall if anyone refused to provide training to her (*see* Decl. of R. Elizabeth Urena, Ex. C, Santos Dep. (hereinafter "Santos Dep.") at 51).

The team developed a training plan for Plaintiff, produced monthly progress reports, which summarized the daily reports of her training, and conducted a monthly skill check on a particular position. In order for Plaintiff to fully certify as an air traffic controller in the Kennedy sector, she had to certify on nine "positions." In January 2002, she was certified on the flight data position.

Plaintiff worked eight-hour days, but did not train constantly. Defendant avers that the limiting factors included the availability of instructors, possible workload, complexity of traffic, and Plaintiff's availability for being at work. (Santos Dep. at 50-51.) Plaintiff tells a somewhat different story. She alleges that the limiting factors were that her primary instructor, Devivo, was assigned to work nights while she was working days and that other air traffic controllers refused to train her. (Pl.'s 56.1 Counterstatement ¶ 33.) Defendant counters that Plaintiff, when working as a developmental, worked both day and night shifts. (Def.'s 56.1 Statement ¶¶ 35, 36 (citing Santos Dep. at 60, 64, though failing to provide copies of those pages).) During this period, Plaintiff made a number of requests for leave days, but those requests were denied.

Problems allegedly developed during Plaintiff's training with regard to her performance. Defendant contends that Santos, "who was familiar with plaintiff's training, believed there were areas of plaintiff's performance that needed improvement each month, and plaintiff did not show improvement." (*Id.* ¶ 38.) Defendant avers that Plaintiff had "consistent separation errors," which is to say she frequently failed to comply with FAA standards of separation to keep airplanes apart. (*Id.* ¶¶ 40-41.) Devivo stated that Plaintiff progressed to a certain level during her training, but then stopped progressing any further. (*Id.* ¶ 44.)

Plaintiff disputes this claim, contending that "[f]our (4) out of the five (5) monthly progress reports Santos completed for Plaintiff state, 'consistent training' in the departure position. . . ." (Pl.'s 56.1 Counterstatement ¶ 38.) Plaintiff also alleges that Starr informed her that "she would have fully certified as an air traffic controller in the Kennedy sector had she received 'more time' and 'consistent training.' " (*Id.*) Finally, Plaintiff asserts that she complained about her sporadic training schedule to Kevin Maney, an air traffic controller and

union representative for the Kennedy sector. Maney replied to her complaint by saying, "If you don't like it, file an EEO – we've been picking and choosing before you got here and we will continue to do it long after you are gone – and if you don't like it, sue us." (*Id.* ¶ 38 (citing Pl.'s Dep. at 117, 135).)

At the center of the dispute regarding Plaintiff's progress and performance is an incident that occurred that the parties discuss as a "pilot deviation" or, alternatively, an "operational error." A "pilot deviation" occurs when a pilot fails to properly execute an instruction. An "operational error" occurs when the air traffic controller makes a mistake and allows planes to pass closer to one another than is allowed. When a developmental is training and working live air traffic with a controller, an operational error is assigned to the instructor, and not to the developmental.

Defendant avers that there were two "operational errors" involving Plaintiff, "one operational error prior to April 2002" (Def.'s 56.1 Statement ¶ 53), and a second on April 21, 2002 ("the April 21 incident"). Though Plaintiff "disputes" the allegation in Def.'s 56.1 Statement ¶ 53, where Defendant refers to an error prior to April 2002, her "dispute" refers to her disagreements regarding the characterization of the April 21, 2002 event. Therefore, beyond using the word "dispute," Plaintiff has not actually disputed the assertion that she was involved with an "operational error" prior to April 2002. Nevertheless, Defendant does not elaborate on the prior "operational error" and it plays no part in the balance of this opinion.

Turning to the April 21 incident, Defendant alleges that a plane began to overtake another. Devivo stated that "[Plaintiff] did not respond to the airplane doing that and [did not] take any action to separate these airplanes." (Def.'s 56.1 Statement ¶ 53 (citing Devivo Dep. at

44-45).) Defendant acknowledges that the FAA determined that the loss of separation was caused by the pilot, that is to say it was not an "operational error," but rather was a "pilot deviation." (*See id.* ¶ 57 ("The situation was *not* determined by the FAA quality assurance to have been an operational error, which is a controller error.") (emphasis added).) Nevertheless, Defendant contends that Plaintiff's response to the error was unsatisfactory. (*See* Devivo Dep. at 45-49.)

After the incident, Plaintiff's training was suspended. Santos recommended that her training be terminated because she was not progressing adequately, maintaining that the April 21 incident was essentially an operational error by Plaintiff. A training review was held on April 30, 2002.

The review board consisted of Theresa Tracy, the manager of the training department when Plaintiff was a developmental, Tony Russo, a supervisor in the Islip sector at the TRACON, and John Gallucci, an air traffic controller in the Newark sector at TRACON. As a result of the review, the panel recommended termination of Plaintiff's training at Kennedy.

On May 13, 2002, Plaintiff subsequently transferred to a position as an air traffic controller at the LaGuardia Tower. Defendant contends that the transfer was the result of Plaintiff's voluntary request (Def.'s 56.1 Statement ¶ 76), while Plaintiff avers that she was "advised [that] if she did not accept the demotion to the LaGuardia Tower, her employment with the FAA would be terminated." (Pl.'s 56.1 Counterstatement ¶ 76.)

The following day, on May 14, 2002, Plaintiff filed an informal grievance with her union. In her grievance, Plaintiff did not make any reference to gender or national origin discrimination, but instead focused her complaint on the fact that the agency was not following training orders

with regard to her training. Santos denied her grievance on June 10, 2002. Plaintiff subsequently sought Equal Employment Opportunity counseling on June 20, 2002 and filed a formal EEOC complaint of discrimination on August 28, 2002.

The EEOC issued to Plaintiff a right to sue letter on April 7, 2003. Plaintiff subsequently filed a *pro se* complaint with this Court on June 30, 2003. Thereafter, Plaintiff acquired legal representation. Defendant now moves for summary judgment.

*STANDARD*

Summary judgment is generally appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994) (quoting Rule 56(c)). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and identifying those materials "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The Second Circuit has "noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 603 (2d Cir. 2006). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It

is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*DISCUSSION*

Defendant moves for summary judgment as to all claims brought by Plaintiff. Regarding the Title VII claim, Defendant asserts that Plaintiff has not only failed to make out a *prima facie* case of discrimination, but has also failed to show that Defendant's proffered legitimate rationale was pretextual. Defendant moves for summary judgment as to the FMLA claim on the grounds that Plaintiff does not have a private cause of action under the statute. Finally, Defendant moves for summary judgment on the discrimination claim brought pursuant to NYSHRL § 296 on the grounds that as a federal employee, federal law provides Plaintiff's only recourse. Plaintiff opposes each of these arguments. The Court considers each in turn.

I. *Employment Discrimination*

Plaintiff brought her claim of gender and national original discrimination pursuant to Title VII. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In Title VII employment discrimination cases, the Court analyzes the claim according to the familiar, tripartite test established in *McDonnell-Douglas*. *See McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

First, Plaintiff must establish a *prima facie* case of discrimination. To establish a *prima facie* case of discrimination, Plaintiff must show (1) she was a member of a protected class; (2)

she applied for an available position for which she was qualified; (3) she suffered an adverse employment action; and (4) the circumstances surrounding that action permit an inference of discrimination. *See Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant, who must then offer a legitimate, non-discriminatory rationale for his or her actions. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). Once the defendant offers such a rationale, "to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Id*. (citation and internal quotation marks omitted). Under this analysis Plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Id.*

    *A.*    *Prima Facie Case*

There is no dispute that Plaintiff is a member of a protected class, both as a result of her gender and her national origin. As for the second factor, Defendant contends that whether Plaintiff was qualified for the position she sought raises an issue of material fact. Thus, Defendant's motion for summary judgment pertains only to the third and fourth factors.

    *1.*    *Adverse Employment Action*

Defendant contends that Plaintiff cannot establish that she was the victim of an adverse employment action under the third factor. "[N]ot every unpleasant matter short of discharge or demotion creates a cause of action" for discrimination. *Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426, 446 (2d Cir. 1999). An "adverse employment action" exists only where the plaintiff endures a "materially adverse change in the terms and conditions of

employment." *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997). To be "materially adverse" a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (citation and quotation marks omitted). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Schiano v. Quality Payroll Systems, Inc*. 445 F.3d 597, 609 (2d Cir. 2006).

Defendant asserts that "most of these allegations do not constitute adverse employment actions" (Def.'s Mem. at 16), which is simply a way of admitting that some of the allegations do constitute adverse employment actions. Plaintiff's classroom training and rejections of her requests for leave were not materially adverse changes in her working conditions. *See, e.g., Fridia v. Henderson*, No. 99 Civ. 10749 (BSJ), 2000 WL 1772779 (S.D.N.Y. Nov. 30, 2000) (finding that treating defendant poorly, assigning her excessive work and denying requests for leave with pay did not constitute an adverse employment action); *Wright v. Milton Paper Co.*, No. 99 Civ. 5724 (SJ), 2002 WL 482536, at *7-8 (E.D.N.Y. Mar. 26, 2002) (finding that where training was completed there was no adverse employment action). It is undisputed, however, that Plaintiff received an negative evaluation, suffered the termination of her on-the-job training, was allegedly forced to accept a "demotion" to the LaGuardia sector, and, as a result of her "demotion," received less compensation. Pursuant to *Schiano*, these incidences constitute adverse employment actions. *Schiano*, 445 F.3d at 609 ("Examples of materially adverse changes include . . . a demotion evidenced by a decrease in wage or salary, a less distinguished

title, . . . or other indices unique to a particular situation."). Therefore, Plaintiff has adequately shown that she suffered an adverse employment action, satisfying the third factor of her *prima facie* case.

## 2. *Circumstances Creating an Inference of Discrimination*

Turning to the fourth factor, Defendant argues that Plaintiff cannot "specify any statements made by Santos or any member of her training team that exhibited a discriminatory animus," nor can she show that any "similarly situated" co-workers were treated differently. (*See* Def.'s Mem. at 18.) Plaintiff's counter-argument is difficult to parse and demonstrates a general misunderstanding regarding the discrimination law: "Plaintiff contends she was denied training which was essential for progressing through training and that a non-similarly situated employee received said training Plaintiff was previously denied and thus advanced." (Pl.'s Opp'n Mem. at 13.) Despite Plaintiff's repeated use of the phrase "non-similarly situated," the Court will assume that Plaintiff intends to assert that similarly situated employees received better treatment than she did and that they received the training that she was denied.

Regarding the fourth factor, the Court must determine whether the proferred evidence shows circumstances that would be sufficient to permit a rational fact-finder to infer a discriminatory motive. *See McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997). A plaintiff may also show that the circumstances surrounding the adverse employment action give rise to an inference of discrimination by demonstrating that "similarly situated employees of a different [gender or national origin] were treated more favorably." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). "To be 'similarly situated,' the individuals with whom [plaintiff] attempts to compare herself must be similarly situated in all material respects."

*Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir. 1997) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). In order to establish that Plaintiff was similarly situated, "other employees must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct." *King v. Aramark Servs., Inc.*, No. 97 Civ. 3924 (JG), 1999 WL 669230, at *10 (E.D.N.Y. Aug. 27, 1999).

Plaintiff refers to seven employees, in support of her case, but none of those employees is "similarly situated" for the purposes of the fourth factor. Plaintiff cites to the deposition testimony of Cindy Hood ("Hood"), an air traffic controller, who indicated that she knew of three Caucasian female air traffic controllers that "washed out"[1] of the Kennedy sector. (*See* Decl. of R. Elizabeth Urena, Ex. F at 36-37.) Plaintiff also cites to the testimony of her husband, John Beauchat, regarding a Caucasian female and an African-American male who "washed out." Apparently misunderstanding the similarly situated analysis, Plaintiff offers these four women and African-American male as "similarly situated employees," but Plaintiff has not shown, or even alleged: (1) that they actually were similarly situated, *i.e.*, that they shared the same supervisors, or engaged in similar conduct; nor (2) that they were treated more favorably. *Cf. Norville*, 196 F.3d at 95. As other employees who "washed out," just like Plaintiff did, they offer no indication that Defendant was treating Plaintiff differently on the basis of her gender or national origin.

---

[1] "To be 'washed out' of training means a developmental's training is terminated and the developmental is not able to certify as an air traffic control specialist in the sector he or she is training in." (Beauchat Aff. ¶ 13.)

Plaintiff's reference to Nathan Enders, a Caucasian male air traffic controller who did not "wash out" similarly fails to satisfy the "similarly situated" analysis. According to Plaintiff, Enders "completed training in the Kennedy sector immediately following Plaintiff's termination after performing two (2) operational errors during training." (Pl.'s Opp'n Mem. at 15 (citing Beauchat Aff. ¶ 23).) Though Enders trained at Kennedy, there is no indication that he reported to the same supervisors, nor is there any explanation regarding his operational errors such that the Court could determine whether they were errors of similar severity. *See Shumway*, 118 F.3d at 64; *see also Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (dictating that similarly situated must be judged based on "whether the conduct for which the employer imposed discipline was of comparable seriousness"). Thus, Plaintiff has failed to show that Enders was similarly situated in a manner that would create an inference of discrimination.

Plaintiff's suggestion that her husband was "similarly situated" similarly fails: he did not have the same supervisor, and he was not involved in any "operational errors" such that the Court could compare the employer's reaction to his errors versus Plaintiff's errors. *See Soderberg v. Gunther Intern., Inc.*, 124 Fed. Appx. 30, 33 (2d Cir. 2005) (affirming that plaintiff had failed to establish a *prima facie* case because she failed to "point to any evidence that other employees, falling outside the protected class but similarly situated to herself in all material respects, received more favorable treatment for comparable unsatisfactory actions").

Because Plaintiff relies entirely upon the "similarly situated" analysis to establish the fourth factor, and has failed to produce any evidence of a "similarly situated" employee receiving preferential or favorable treatment, she has failed to create an inference of discrimination. Accordingly, she has failed to establish a *prima facie* case of discrimination. Admittedly,

Plaintiff has made a case that she received harsh treatment from Santos and she suggests that the reason for her termination was unreasonable because the FAA determined that it was a "pilot deviation" rather than an "operational error." Assessing the reasonableness of employment decisions that lack the air of discriminatory animus, however, is this outside of this Court's province. The Court's role is "to prevent unlawful hiring practices, not to act as a superpersonnel department that second guesses employers' business judgments." *Byrnie v. Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir.2001); *see also Diaz v. TMC Services*, No. 04 Civ. 10310 (RWS), 2006 WL 2589186, at *9 (S.D.N.Y. Aug. 31, 2006). As such, Plaintiff's Title VII claims fail as a matter of law.

    B.    *Legitimate Rationale*

Despite the fact that Plaintiff has failed to make out a *prima facie* case of discrimination, it is instructive to consider the facts surrounding the "operational error"/"pilot deviation" that precipitated Plaintiff's termination. These facts constitute Defendant's legitimate rationale.

Devivo's account is not disputed by either party. On April 21, 2002, two planes were not responding to Plaintiff's instructions. As a result, "you've got one big airplane out here and another big airplane cutting him off like this (indicating)." (Devivo Dep. at 44-45.) Devivo continued:

> Ms. Beauchat did not respond to the airplane doing that and take any action to separate these airplanes. With 500, 600 people on board of these airplanes, you have to be aware of where they are and what they're doing.
>
> They don't always do what you want . . . . And we lost separation of those two airplanes, because by the time I waited for her to realize what was happening and take appropriate steps, there were many things that she could have done to separate them.

She did nothing. She was unaware of the situation at the time . . . . She did not take sufficient or appropriate action to ensure the separation of the airplanes. They were not separated by FAA standards. Normally, that would have been on my part an operational error requiring my immediate decertification, retraining, and a lot of other nasty things that we don't want to get into.

But, because the – the quality assurance looked at it and said that the American Airlines pilot did not do what he was supposed to do in the first place, that was the cause of the error. It was not my fault.

So that was not listed as an operational error to me, but in my opinion it should have been. We're responsible to make sure that these airplanes do what they have to do. It's tight air space. There are a lot of people counting on what we do all the time.

[. . . ]

Any operational error assigned at that position would be assigned to the instructor, never the trainee. The trainee, doesn't matter. She can do that 19,000 times and never would a trainee have an operational error.

Q: But this quality assurance group found that it wasn't an operational error as to you; is that correct?

Devivo: That's correct. They called it a pilot deviation to the pilot, but – and this is a big but. This happens not that infrequently that the pilot doesn't do exactly what they're supposed to do.

This is what the controller is there for. . . . There were numerous things that could have been done. That's what – you know, there are times when you can't do anything.

But those situations are rare. We're supposed to keep ourselves out of those situations. This situation, there was no reason for those planes to have lost separation for each other, except I tried to let her identify that situation and correct it and it got too far before I was able to stop it.

Q: But then the quality assurance folks wound up saying it was a pilot issue; is that correct?

Devivo: Because it was the pilot who initiated the problem. But we are responsible for taking care of this.

-15-

(Devivo Dep. at 44-49.) On this account, Plaintiff accurately argues that she was fired due to a situation that the FAA determined to be a "pilot deviation" rather than an "operational error." She does not dispute Devivo's account, however, which indicates that her superiors viewed Plaintiff's response to the "pilot deviation" as wholly unsatisfactory.

Contrary to Plaintiff's conclusory disagreement, this account is not "so unbelievable in light of the evidence that a jury could, and would, likely reject it." (Pl.'s Opp'n Mem. at 17.) Plaintiff does not offer anything else to establish that Defendant's legitimate rationale was pretextual. Plaintiff alleged that she was fired when her superiors assigned her an "operational error" even though the FAA determined that it was in fact a "pilot deviation." Devivo does not contend anything to the contrary; he simply adds that it was Plaintiff's job to compensate for the pilot's error and she failed to do so. Thus, Devivo's account is perfectly consistent with Plaintiff's account; Plaintiff just omitted the most salient details. As a result, even if Plaintiff had established a *prima facie* case, the Court would have alternatively found that she had failed to provide any evidence to suggest that Defendant's proffered legitimate rationale was pretextual.

## II. FMLA

Defendant moves to dismiss the FMLA claims on the grounds that federal employees, such as Plaintiff, do not have a private right of action under the FMLA. (Def.'s Mem. at 22.) Plaintiff does not address this argument in her opposition memorandum.

Defendant is undoubtedly correct. Although the FMLA grants a private right of action to an employee in the private sector who alleges violation of FMLA rights, *see* 29 U.S.C. § 2617(a)(2) (1994), the FMLA does not afford such a right of action to a federal employee, *see* 5 U.S.C. §§ 6381-6387. "The courts have recognized the distinction between private sector

employees and federal government employees with regard to enforcement rights and have held that no independent right of action is available to federal government employees to enforce their FMLA rights." *Bogumill v. Office of Personnel Management*, 168 F.3d 1320 (Fed. Cir. 1998); *see also Russell v. United States Dept. of the Army*, 191 F.3d 1016, 1019 (9th Cir. 1999) ("the absence of an express waiver of the government's sovereign immunity in Title II of the FMLA bars private suits for violations of its provisions"); *Mann v. Haigh*, 120 F.3d 34, 37 (4th Cir. 1997); *Keen v. Brown*, 958 F. Supp. 70, 72-75 (D. Conn. 1997); *cf. Chafetz v. Roosevelt Island Operating Corp.*, No. 97 Civ. 0761 (NRB), 2000 WL 1277337, at *2 n.5 (S.D.N.Y. Sept. 8, 2000) ("We also note the overwhelming consensus among the other Circuit Courts of Appeals that the FMLA is not a valid abrogation of states' immunity."). Accordingly, because Plaintiff is a federal employee, she has no private right of action under the FMLA, and the FMLA claim must be dismissed.

### III. State Law Claims

Finally, Defendant moves to dismiss Plaintiff's state law discrimination claims on the grounds that those claims are preempted by federal discrimination law. (*See* Def.'s Mem. at 21.) Plaintiff does not address this argument in her opposition memorandum.

In *Brown v. General Servs. Admin.*, 425 U.S. 820 (1976), the Supreme Court held that section 717 of the Civil Rights Act of 1964 "provides the exclusive judicial remedy for claims of discrimination in federal employment." *Id*. at 835. The Second Circuit cited this language in *Rivera v. Heyman*, 157 F.3d 101, 105 (2d Cir. 1998), to preclude a federal employee from bringing discrimination claims pursuant to New York state laws. As a result, Plaintiff's state law discrimination claims must be dismissed as they are preempted by federal discrimination law.

## *CONCLUSION*

Plaintiff has failed to establish a *prima facie* case of discrimination, and, alternatively, she has failed to provide any indication that Defendant's legitimate rationale for her termination was pretextual. Plaintiff's other claims are barred by either sovereign immunity or federal preemption. Accordingly, the Court GRANTS Defendant's motion for summary judgment in its entirety. The Clerk of the Court is direct to close this case.

**SO ORDERED.**

Dated: Central Islip, N.Y.  /s/
September 21, 2006  Denis R. Hurley
United States Senior District Judge